IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DONNA NEIL,

      Plaintiff,

v.                                                                                    Case No.  24-2602-JWB

KMT WATERJET SYSTEMS, INC. and
FLOW INTERNATIONAL CORPORATION,

      Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendants' motion for summary judgment (Doc. 86); Plaintiff's motion to exclude the testimony of Ronald H. Saff, M.D. (Doc. 80); Plaintiff's motion for spoliation sanctions (Doc. 83); and Plaintiff's objections (Doc. 89) to the pretrial order.  The motions are fully briefed and ripe for decision.  (Docs. 87, 90, 91, 98, 101, 102, 103, 106.)  For the reasons stated herein, Defendants' motion for summary judgment (Doc. 86) is GRANTED IN PART and DENIED IN PART; Plaintiff's motion to exclude the testimony of Dr. Saff (Doc. 80) is DENIED IN PART and DENIED WITHOUT PREJUDICE IN PART; Plaintiff's motion for spoliation sanctions (Doc. 83) is DENIED IN PART and DENIED WITHOUT PREJUDICE IN PART; and Plaintiff's pretrial order objections (Doc. 89) are OVERRULED.

I.     **Facts**

The facts[1] set forth herein are material to the issues on summary judgment and are undisputed, or where disputed, viewed in the light most favorable to Plaintiff.  This is an employment action brought under state and federal law.  Donna Neil ("Plaintiff") brings this

---

[1] Plaintiff sets forth many additional facts in her response (Doc. 102 at 13–25), to which Defendants respond in their reply (Doc. 106 at 9–17).  Many of these facts and responses are not disputes—in that the disputed fact is immaterial or argumentative.  The additional facts and responses that are immaterial or argumentative will not be considered.

lawsuit against her former employer, KMT Waterjet Systems, Inc. ("KMT"), and Flow International Corporation ("Flow") (collectively, "Defendants"), both of which are subsidiaries of Shape Technologies, Inc. ("Shape").  Shape has been terminated as a defendant.  (Doc. 34.)

KMT operates a manufacturing facility in Baxter Springs, Kansas.  (Pretrial Order Stipulations, Doc. 77 at 2.)  At that facility, KMT employs approximately 130 individuals.  (Doc. 87 at 4.)  KMT hired Plaintiff as its human resources manager for that facility on or about October 17, 2022.  (*Id*.)  The relevant employees during Plaintiff's employment were as follows.  Plaintiff's direct supervisor was Glenda Madison ("Madison"), Flow's HR Director of Americas, who in turn reported to Shelly Evoy ("Evoy"), Flow's vice president of Global Human Resources.  Michael Barber ("Barber") served as KMT's Managing Director for the Baxter Springs facility, and Darrick Thomas ("Thomas") served as its Maintenance Manager.  After Plaintiff's termination, KMT hired Anthony Westfield ("Westfield") as the new Baxter Springs HR Manager; Westfield also testified as Defendants' corporate representative in this litigation.  (*Id*. at 2–3.)

KMT's Baxter Springs facility consisted of several buildings.  The main building where nearly all of the 130 employees were stationed was "Building 1."  (*Id*.)  The only other relevant building can best be described as an administrative building and is referred to as "Building 3." (*Id*.)  Plaintiff's office was located in Building 1 and Madison's in Building 3.  Defendants described the distance between the two buildings as a three- to five-minute walk and gave examples of the necessity for employees from the two buildings to regularly interact with each other.  (Westfield Depo., Doc. 102-24 at 17:8–15; Barber Depo., Doc. 106-15 at 41:7–10.)

On Plaintiff's first day of work, October 17, 2022, she noticed and smelled what she believed to be mold in her office and began experiencing allergic reactions and breathing difficulties.  (Plaintiff Depo., Doc. 102-1 at 91:8–92:9.)  Madison's testimony supports this, as she

2

explained also having difficulty breathing while in Plaintiff's office. (Madison Depo., Doc. 102-7 at 48:7-14.) From the week she started through January 2023, Plaintiff's symptoms required multiple visits to urgent care and medical centers, where she was prescribed rounds of antibiotics and steroids and treated for various respiratory and bronchial conditions. (Doc. 102-43.) Plaintiff first informed Madison and Evoy about the conditions of her office in October 2022 and continued raising those concerns with multiple members of management through January 2023. (Plaintiff Depo., Doc. 102-1 at 95:18–99:8.) Despite those complaints, meaningful remediation of Plaintiff's office would not come until January 2023—and even then, only partially.

In January 2023, Plaintiff's symptoms significantly worsened, and she sought treatment at a hospital in Oklahoma on three separate occasions. (Doc. 102-43 at 2–3.) During her January 5 visit, she was diagnosed with generalized anxiety disorder ("GAD"), on January 10, she was diagnosed with Hashimoto's disease, an autoimmune disorder affecting the thyroid and causing inflammation and muscle and joint pain, and she returned on January 19 for ongoing respiratory treatment. Plaintiff testified—and her medical records confirm—that these diagnosed conditions caused breathing difficulties, problems walking, concentrating, and sleeping, among other impairments. Plaintiff described these symptoms as recurring, both inside and outside of the workplace.

On January 12, Plaintiff emailed Barber and Madison informing them of her ongoing "respiratory issues" since October and attributed them to her office. (Doc. 102-6.) Specifically, she stated that she was under a doctor's care and requested an office change as a "reasonable accommodation." (*Id*.) Barber replied to the email stating he needed Plaintiff in Building 1. Barber later testified that he wanted her present there because he "didn't want [Building 1 employees] having to walk all the way over to" Building 3. (Barber Depo., Doc. 87-3 at 2–3.)

3

The next day, on January 13, Plaintiff submitted a formal Americans with Disabilities Act ("ADA")[2] accommodation request to Madison, asking to relocate her to an office in Building 3 that was "without . . . mold toxicity," because her health symptoms were being exacerbated. (Doc. 102-8.)   Madison approved her request on January 16, knowing Barber had previously told Plaintiff he needed her in Building 1.   Madison testified that she believed denying the request without engaging in an interactive process would be inconsistent with ADA obligations. (Madison Depo., Doc. 102-7 at 34:14–37:15.)   Madison was terminated on January 19, making Evoy Plaintiff's direct supervisor. (Doc. 87 at 8.)   The consequences of that personnel change were immediate: that same day, Barber told Plaintiff to return to her office in Building 1, effectively reversing the accommodation Madison had approved of just three days earlier.  (Plaintiff Depo., Doc. 102-1 at 147:2–149:9.)   The reversal is particularly notable given that Evoy, Plaintiff's new supervisor, messaged her that same day acknowledging that Building 1 was "not likely helping matters" and was "possibly the cause" of Plaintiff's health problems.  (Doc. 102-13 at 2–3.)

After returning to her office in Building 1 on January 19, Plaintiff conducted an air quality test using a petri dish kit from Lowe's which showed visible mold growth after four days.  (Doc. 102-5.)   On January 23, Plaintiff emailed Thomas and Barber and separately emailed Evoy, attaching photographs of the petri dish and describing the samples she had collected.  (*Id*.)  Evoy did not respond. (Doc. 102 at 17.)   That same day, Plaintiff met with Barber, explained her health problems, and attributed it to mold exposure.  (Plaintiff Depo., Doc. 102-1 at 113:17-116:4.)   Barber instructed Plaintiff to stop investigating the mold issue and that he would have KMT's maintenance manager, Thomas, conduct additional tests on and clean the office.  (Barber Depo., Doc. 106-15 at 8–10.)   Thomas did so and while inspecting, changed the HVAC filters and

---

[2] The governing law is the ADA Amendments Act of 2008 ("ADAAA"), and the court applies the amended statute and regulations.  However, for ease of reference the court continues to use the term "ADA."

4

conducted his own mold test.  (Thomas Depo., Doc. 102-35 at 46:17–47:17.)  Thomas testified that his mold test showed no significant growth, but Plaintiff disputes this, noting that no records of the results Thomas allegedly collected exist in the record.  (*Id*. at 69:14-71:15.)  Moreover, internal email correspondence from August 2023—sent between Robinson and Evoy, months after Plaintiff's termination—shows Defendants' own decision-makers acknowledging that Barber and Thomas had not taken Plaintiff's mold complaints seriously and that nothing substantive had been done to address the issue. (Doc. 102-23; Robinson Depo., Doc. 102-17 at 48:7–50:13.)  Consistent with that acknowledgment, it was not until August 2023—nearly six months after Plaintiff went on leave and well after her termination—that Defendants first retained a professional firm, Springfield Quality Services, to conduct a formal mold assessment of Plaintiff's office.  (Doc. 87 at 6; *see also* Doc. 102-38.)  In the report's summary, it is indicated that while no mold was observed, their tests discovered the presence of mold spores and recommended that the HVAC system associated with the office be "thoroughly cleaned." (Doc. 102-38 at 2.)

On February 16, 2023, Plaintiff again emailed Evoy requesting approval to purchase air purifiers that could kill mold.  (Doc. 102-45.)  Evoy did not respond.  With her health continuing to deteriorate, on February 20, Plaintiff sought workers' compensation ("WC") benefits and applied for short-term disability ("STD") leave through Defendants' third-party administrator Symetra. (Doc. 102-11.)  Plaintiff's STD leave was approved through May 30, notably identifying an expected return to work date of July 2023.  (*Id*.)

Following the termination of Madison, Laura Robinson was hired to replace her as the new HR Director of Americas in March. (Doc. 87 at 10.)  To cover Plaintiff's on-site HR duties during her absence, Evoy and Robinson alternated traveling from their respective remote locations to the Baxter Springs facility every other week.  In so doing, Defendants determined that the HR manager

position needed to be filled while Plaintiff was on her approved STD leave.  Accordingly, on May 1, 2023—while Plaintiff was still on approved STD leave—KMT hired Anthony Westfield as the new Baxter Springs HR Manager.  (Doc. 102 at 18.)  Westfield initially worked in the same Building 1 office Plaintiff previously occupied and moved to Building 3 in 2025.  (Doc. 106 at 12.)  However, Westfield testified that nothing about officing in Building 3 prevented him from accomplishing the essential functions of his job.  (Westfield Depo., Doc. 102-24 at 13:11–15.)

On May 5, Plaintiff's WC attorney mailed a letter to KMT that included an Independent Medical Evaluation Report ("IMER") by Dr. Pedro Murati, dated April 20, 2023.  (Doc. 102-10 at 3–6.)  The report opined that Plaintiff's workplace was the prevailing factor in the development of her diagnoses of GAD, Hashimoto's disease, and asthma-related symptoms.  On May 8, Plaintiff mailed a letter[3] to Defendants advising them that her treating physician, Dr. Bradley Wajda, had provided this return-to-work date of July 15 and requested long-term disability ("LTD") leave to bridge the gap between the May 30 expiration of her STD benefits and July 15.  (Doc. 102-46.)  The letter further stated that she had been "medically advised" to not return to Building 1 because of her reaction to the building's environment.  This advisement appears to have come from Dr. Wajda, whose May 5 treatment notes reflect an anticipated July 15 return-to-work date.  (Doc. 87-19.)

---

[3] Defendants dispute receiving the May 8 letter.  (Doc. 106 at 8, 13.)  "A rebuttable presumption of receipt does arise on evidence that a properly addressed piece of mail is placed in the care of the postal service."  *Witt v. Roadway Exp.*, 136 F.3d 1424, 1429–30 (10th Cir. 1998).  Plaintiff claims in her affidavit to have satisfied that standard and attaches the letter.  (Docs. 102-43 at 5; 102-46.)  "Because the presumption is rebuttable, however, evidence denying receipt creates a credibility issue that must be resolved by the trier of fact."  *Witt*, 136 F.3d at 1430.  Defendants, likewise, have rebutted the presumption.  Therefore, the court finds a genuine dispute as to a material fact exists and, in viewing the evidence in the light most favorable to Plaintiff, the court considers Defendants to have received the letter for purposes of this motion.  Further, email correspondence from June 4–5 amongst Defendants as well as testimony indicates that they had knowledge of the information in the May 8 letter.  (Doc. 102-47; Robinson Depo., Doc. 102-17 at 31:16-32:10.)  Thus, the court has no concerns viewing the letter as received by Defendants at this stage.

6

On May 31, Symetra received Plaintiff's application for LTD benefits and Robinson and Evoy were notified of the pending application. (Doc. 87-18 at 1–2.) On June 4, Plaintiff again reached out to Evoy regarding Symetra's LTD policy, this time by email; Evoy forwarded that email to Robinson. (Doc. 102-47.) However, Plaintiff received no response from either. Robinson testified that no one contacted Plaintiff about her return-to-work date or LTD policy because Defendants' attorneys had advised against doing so. (Robinson Depo., Doc. 102-17 at 32:25–33:7.) Plaintiff therefore had no indication that her employment was in jeopardy during this period—she had communicated a return date, applied for bridging leave, and heard nothing.

While Plaintiff's LTD application was pending, Robinson reviewed Plaintiff's leave status during the first week of June 2023, concluded that Plaintiff had exhausted her STD leave without returning to the facility, and determined that the HR Manager position needed to be filled permanently. (*Id*. at 29:2–30:5.) Accordingly, Plaintiff was terminated effective June 30, by a letter dated June 28, 2023. (Doc. 102-20.) The termination letter stated, in relevant part: "We have completed a companywide audit of all employees on disability leave. At this time, you have exhausted your leave of absence and do not qualify for [the Family and Medical Leave Act ("FMLA")]. Therefore, we have filled your position." (*Id*.) The record, however, reflects conflicting explanations for Plaintiff's termination that will be addressed in more detail below.

In September 2023, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Kansas Human Rights Commission and subsequently filed this action. (Docs. 102-28; 1.) On July 9, 2025, Plaintiff filed her first amended complaint ("FAC") and brings four claims: failure to accommodate ("Count I") and retaliation ("Count II") both in violation of the ADA and two state law claims for wrongful termination in violation of public policy for workers' compensation retaliation ("Count III") and for whistleblowing ("Count

IV"). (Doc. 34.) The court will provide additional facts relevant to specific motions or arguments raised by the parties in their submissions.

## II.     Analysis

### A. Spoliation Sanctions

Plaintiff moves for spoliation sanctions against Defendants. (Doc. 83.) The motion has been fully briefed (Docs. 90, 98) and is denied in part and denied without prejudice in part.

On June 28, 2023, Robinson, the Director of HR for Flow, sent Plaintiff a termination letter bearing the subject line "Leave Exhausted Employment Separation." (Doc. 83-17.) The letter stated, in part: "We have completed a companywide audit of all employees on disability leave. At this time, you have exhausted your leave of absence and do not qualify for [FMLA]. Therefore, we have filled your position." (*Id*.) Subsequently, Robinson testified that she created "12 or 14" substantially identical termination letters for employees who had exhausted their leave at the same time that she created Plaintiff's. (Robinson Depo., Doc. 83-16 at 20:23–22:7.) She went on to explain that she mailed those letters to the other employees and stored the drafts on her laptop. (*Id*. at 24:17–27:8.) Eventually, when Robinson's employment terminated in March 2024, she mailed the laptop back to Flow. (*Id*.) To date, however, Defendants have been unable to locate these letters while simultaneously disputing their existence.

Plaintiff sought these letters because she says they are central to her theory that her termination was pretextual. She contends that if Defendants really conducted a "companywide audit" resulting in terminations, the letters would reveal the circumstances surrounding their termination. (Doc. 83 at 17–18.) Specifically, Plaintiff hoped to explore whether comparably situated employees on disability leave were treated differently by examining the type and duration of leave used by other employees, whether they had return-to-work dates, and whether they, like

Plaintiff, were on workers' compensation leave. (*Id*.)  To support her assumption, Plaintiff points to the Defendants' leave of absence report (Doc. 83-23) which, in combination with Westfield's testimony, indicates that as of the date Plaintiff was terminated, multiple other KMT employees were not terminated but had been on leave longer than Plaintiff and, importantly, longer than allowed under Defendants' disability leave policy. (Westfield Depo., Doc. 83-18 at 65:2–68:2.)

Plaintiff argues she is prejudiced because she is unable to use the letters to prove the retaliatory and discriminatory nature of her termination.  (Doc. 83 at 10, 16–17.)  Plaintiff's requested relief includes introducing evidence related to Defendants' failure to preserve the termination letters, that the court allow argument to the jury that such evidence allows the jury to infer that the termination letters would have been unfavorable, exclusion of evidence relating to Defendants' proffered reason for her termination, and an adverse inference jury instruction.  (*Id*.)

Defendants first contend that no other employees were terminated as a result of the audit, and therefore the comparator termination letters Plaintiff seeks do not exist.  (Doc. 90 at 4–5.)  Because no comparators were terminated, Defendants argue Plaintiff cannot claim prejudice.  (*Id*. at 5.)  Alternatively, Defendants claim that if such termination letters did exist, their loss was the result of an IT error, not an act of suppression.  (*Id*. at 1.)  Defendants acknowledge that certain draft documents stored on Robinson's personal OneDrive were lost due to automated retention policies that IT failed to suspend following her departure.  Finally, Defendants maintain that internal communications between Defendants' employees responsible for Plaintiff's termination confirm the decision to terminate was driven by her exhaustion of leave weeks before the termination letter was drafted, rendering the audit and letters themselves immaterial.  (*Id*. at 2, 8.)

"Spoliation sanctions are proper when (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was

prejudiced by the destruction of the evidence." *E.E.O.C. v. JetStream Ground Servs., Inc.*, 878 F.3d 960, 964 (10th Cir. 2017) (internal quotations omitted). The court has the authority to impose sanctions if electronically stored information ("ESI") that should have been preserved is lost because a party failed to take reasonable steps to preserve it. Fed. R. Civ. P. 37(e); *Helget v. City of Hays*, 844 F.3d 1216, 1226 (10th Cir. 2017) ("[A] district court has broad discretion in choosing an appropriate sanction for spoliation, the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.").

The parties do not contest that Defendants had a duty to preserve evidence once the EEOC charge was received in September 2023, satisfying the first element. The dispute centers on whether the termination letters ever existed and, if they did, whether Plaintiff was prejudiced by their loss. "[S]poliation of evidence causes prejudice when . . . the party claiming spoliation cannot present evidence essential to the underlying claim." *CCA Recordings 2255 Litig. v. United States*, 2021 WL 2212758, at *6 (D. Kan. June 1, 2021). It's not enough to raise theoretical prejudice that the harm "cannot be known because the documents and information no longer exist." *Linnebur v. United Tel. Ass'n*, No. 10-1379-RDR, 2011 WL 13238497, at *5 (D. Kan. Mar. 24, 2011) (citing *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1150 (10th Cir. 2009)). Thus, "a party seeking spoliation sanctions must present evidence that it was actually prejudiced." *Id*. Plaintiff has not.

The comparator information she contends the letters would have provided is substantially already in the record. Defendants produced the leave of absence report—the spreadsheet Robinson claims to have used in her audit and subsequent sending of termination letters—which identifies all KMT employees on leave and the length of that leave, at the time of Plaintiff's termination. (Docs. 83-22; 83-23.) In contradiction, Westfield testified that no employees were terminated because of the audit. (Westfield Depo., Doc. 83-18 at 168:15–169:10.) Such testimony is itself

10

comparator evidence: it purports to establish that other employees on comparable or longer leave were not terminated. Because comparator information is in the record, any prejudice from the absence of the letters is cumulative. *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007) (finding no prejudice where same information was available). Accordingly, because actual prejudice was not demonstrated, the court need not reach the question of bad faith. *Ad Astra Recovery Servs., Inc. v. Heath*, 2020 WL 969762, at *7 (D. Kan. Feb. 28, 2020).[4]

Because Plaintiff has not demonstrated actual prejudice, her motion for sanctions is denied. The court denies Plaintiff's motion in so far as it seeks adverse-inference instructions, exclusion of evidence relating to Defendants' proffered reason for her termination, attorney fees, and other monetary sanctions. The court denies the remainder of Plaintiff's motion without prejudice, allowing Plaintiff to introduce evidence related to Defendants' failure to preserve the termination letters and decide issues of admission or exclusion of such evidence at the time of trial.

### B. Exclude Expert Testimony

Plaintiff moves to exclude the testimony of Dr. Ronald H. Saff, M.D. (Doc. 80.) The motion has been fully briefed (Docs. 91, 103) and is denied in part and denied without prejudice in part.[5] District courts have broad discretion to determine whether a proposed expert may testify. *United States v. Nichols*, 169 F.3d 1255, 1265 (10th Cir. 1999). Federal Rule of Evidence 702, which controls the admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[4] Even assuming prejudice, Plaintiff has not demonstrated bad faith—the loss resulted from Defendants' failure to suspend routine IT practices, which is insufficient for an adverse inference instruction. *See Turner*, 563 F.3d at 1149.
[5] Plaintiff requested the opportunity to address certain of Defendants' statements of fact if the court denied her *Daubert* motion. (Doc. 102 at 1, n.1.) This request is denied. Plaintiff concedes she addressed those facts in her *Daubert* motion. Further, her motion was denied without prejudice in part, so Plaintiff can address those facts in the future if necessary.

11

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony bears the burden of showing the testimony is admissible. *Hampton v. Utah Dep't of Corr.*, 87 F.4th 1183, 1201 (10th Cir. 2023). First, the district court must determine whether the witness is qualified to render an opinion by knowledge, skill, training, experience, or education. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018)). If qualified, "the district court must satisfy itself that the testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *Id.* "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (citation omitted). A district court should focus on an expert's methodology and not "the conclusions that they generate." *Id.* at 595. But an expert's conclusions are not immune from scrutiny, such as when "there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222–23 (10th Cir. 2003).

On September 2, 2025, Dr. Saff, Defendants' retained expert, rendered a 4-page opinion. (Doc. 80-18.) It boils down to the contention that mold exposure did not cause Plaintiff's health problems; rather, her problems were cause by a combination of the side effects of medication and psychiatric illnesses. (*Id.*) As such, Dr. Saff opines that because mold exposure did not cause Plaintiff's symptoms, moving her to Building 3 (her requested accommodation) would not have been effective. (*Id.*) Finally, the opinion expresses "skepticism" surrounding Dr. Murati's evaluation and opinion of Plaintiff done as part of her workers compensation claim in April 2023. (Doc. 80-12 at 2–6.) Plaintiff moves to exclude Dr. Saff's testimony on the grounds it is irrelevant

12

because the medical cause of her symptoms is not an element of her claims.  (Doc. 80 at 5.) Defendants respond arguing that Dr. Saff's testimony is relevant to refute the elements of Plaintiff's claims.  (Doc. 91 at 3–6.)

First, the court finds Dr. Saff qualified to testify based on his knowledge, skill, training, experience, and education as indicated in his report and that his opinion is reliable based on the records he has evaluated.  (Doc. 80-18.)  Turning to the relevancy of his opinion, at the outset, the court notes that it is not immediately clear whether Plaintiff's motion seeks to exclude Dr. Saff's testimony entirely or only specific aspects of his report with which the motion takes issue.  (Doc. 80.)  One specific opinion Plaintiff points out is Dr. Saff's opinion that mold in the workplace did not cause Plaintiff's symptoms.  (*Id*. at 6–7, 10.)  There can be no doubt that Dr. Saff's opinion regarding the medical cause of Plaintiff's symptoms is relevant and may assist the trier of fact.  To be sure, Dr. Saff may not opine on ultimate legal issues—such as whether Plaintiff is a "qualified individual" or whether her requested accommodation was "reasonable" as those terms are defined by law.  *United States v. Schneider*, 704 F.3d 1287, 1294 (10th Cir. 2013).  However, the question of what medically caused Plaintiff's symptoms is a factual predicate that underlies those determinations.  If Plaintiff's symptoms were not caused by mold exposure in her workplace, a jury could reasonably conclude that relocating her to Building 3 (her accommodation request) would not have enabled her to perform the essential functions of her job, rendering her unqualified under the ADA and unable to make a prima facie case. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018).  Thus, Dr. Saff's causation opinion is sufficiently tied to the facts at issue in this case, and Plaintiff's challenges to its weight and credibility are properly addressed through cross-examination.  Accordingly, the court denies the motion to exclude Dr. Saff's

13

testimony without prejudice.  However, Plaintiff is free to raise her objections at a later, more appropriate juncture, such as through a motion in limine or during cross-examination at trial.

Plaintiff also moves to exclude Dr. Saff's testimony on the grounds that his opinion belongs solely before an administrative law judge ("ALJ") under the Kansas Workers' Compensation Act ("KWCA"), K.S.A. § 44-501 *et seq.*, because the KWCA provides the exclusive remedy for Plaintiff's claims.   (Doc. 80 at 8–10.)  Defendants respond that the KWCA does not dictate the admissibility of evidence in a federal discrimination trial.  (Doc. 91 at 6–8.)  Plaintiff's argument is meritless.  The KWCA is a liability scheme, not an evidentiary rule.  It provides the exclusive remedy for claims arising from on-the-job injuries.  K.S.A. § 44-508(f)(2)(B).  Plaintiff's ADA claims do not require proof of an on-the-job injury; they require proof of certain elements *as defined* by the ADA.  *See* 42 U.S.C. § 12112; *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020).  The KWCA's exclusive-remedy provision has no bearing on whether a federal court adjudicating an ADA discrimination claim may hear medical evidence.  Plaintiff's motion to exclude is denied to the extent it seeks to limit Dr. Saff's testimony under the KWCA.  Having resolved these threshold issues, the court turns to Defendants' summary judgment motion.

### C.  Summary Judgment

Defendants have moved for summary judgment on all of Plaintiff's claims.  (Doc. 86.)  Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247– 48 (1986).  "A fact is material if, under the governing law, it could have an effect on the outcome of the

lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). In considering a motion for summary judgment, the facts set forth in the motion must refer "with particularity to those portions of the record upon which" the moving party relies. D. Kan. R. 56.1(a). "All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." *Id*. To properly dispute a proposed statement of material fact, the opposing party must "refer with particularity to those portions of the record upon which the opposing party relies." D. Kan. R. 56.1(b)(1). Failure to properly controvert a proposed fact that is properly supported will result in a determination that the fact is admitted. *Coleman v. Blue Cross Blue Shield of Kan., Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008) (finding that the "district court was correct to admit all facts asserted in [the movants] summary judgment motion that are not controverted by a readily identifiable portion of the record.") (internal quotation and citation omitted). The court will address each of Plaintiff's claims in turn.

### 1. ADA Discrimination: Failure to Accommodate ("Count I")[6]

---

[6] In Plaintiff's response to the motion for summary judgment, she states the prima facie elements for both a disability discrimination claim and a failure to accommodate claim under the ADA, seemingly framing them as two claims. (Doc. 102 at 25–26.) However, in the remainder of her brief, she makes arguments and alleges facts relevant only to a failure to accommodate claim. Moreover, the pretrial order only lists a failure to accommodate claim. (Doc. 77.) So for clarity, the court holds that Plaintiff has not brought an ADA disability discrimination claim independent of her failure to accommodate claim. To the extent Plaintiff sought to bring such a claim, it is waived. *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[C]laims . . . not included in the pretrial order are waived.").

Plaintiff asserts that Defendant discriminated against her in violation of the ADA by failing to provide a reasonable accommodation. The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to [the] other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." *Id*. § 12112(b)(5)(A). A failure to accommodate claim based on circumstantial evidence is evaluated under a modified *McDonnell Douglas* burden-shifting framework. *Aubrey*, 975 F.3d at 1005; *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 538 (10th Cir. 2014); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under the first step, Plaintiff must demonstrate that (1) she is disabled; (2) she is a qualified individual; (3) she requested a plausibly reasonable accommodation, and (4) the employer refused to accommodate her disability. *Aubrey*, 975 F.3d at 1005. Defendants move for summary judgment on the basis that Plaintiff cannot establish the first, second, or third prong of her prima facie case. (*See* Doc. 87 at 12–24.)

Regarding the first prong, Defendants offer two arguments. First, that Plaintiff is not disabled because her alleged disabilities are temporary and situational. (*Id*. at 13.) Second, her alleged disabilities are unsupported by expert evidence. The court disagrees with both.

To prove that she is disabled, Plaintiff must: "(1) have a recognized impairment; (2) identify one or more appropriate major life activities; and (3) show that the impairment substantially limits one or more of those activities." *Sanchez v. Vilsack*, 695 F.3d 1174, 1178 (10th Cir. 2012). In determining whether Plaintiff has satisfied her burden, the court considers the nature and severity of the impairment, duration of impairment, and any permanent or long-term impact from the impairment. *Id*.

16

Plaintiff's alleged impairments are anxiety, Hashimoto's disease, and asthma. (Doc. 77 at 20.) Defendants dispute whether Plaintiff's impairments substantially limit concentrating, breathing, walking, caring for herself, or other major life activities because they are temporary and situational in that they were only triggered when Plaintiff was inside Building 1. (Doc. 87 at 13–14.) In response, Plaintiff points to her worsening condition and evidence of the medical treatment she received in the months after beginning her STD leave during which she did not set foot in Building 1. (Doc. 102 at 28–29.) Moreover, Plaintiff points to the expanded scope of disability under the ADA to include "impairment[s] that [are] episodic." 42 U.S.C. § 12102(4)(D); *Brunner v. GN Bank, N.A.*, No. 21-CV-02242-TC, 2023 WL 2474683, at *8 (D. Kan. Mar. 13, 2023) (holding episodic migraines are a disability). In considering the medical interventions Plaintiff received during the period after she left Building 1, and the expanded definition of disability, the court finds genuine issues of material fact exist as to whether Plaintiff's asthma, anxiety, and Hashimoto's disease constitute disabilities under the ADA. *Sanchez*, 695 F.3d at 1178–79 ("[W]hether the impairment substantially limits a major life activity is ordinarily a question of fact for the jury"); *Markham v. Boeing Co.*, 2011 WL 6217117, at *3 (D. Kan. Dec. 14, 2011) (explaining the ADAAA "lowered the bar" on the disability inquiry by expanding its definition); *see also* 42 U.S.C. § 12102(2)(B) (major life activity includes endocrine function; thyroid is part of the endocrine system).

Second, Defendants argue Plaintiff is not disabled because her alleged disabilities lack expert evidence. (Doc. 87 at 14.) The court disagrees. While the Tenth Circuit has stated that "[e]xpert medical testimony may be used to establish a plaintiff's disability" it went on to state that "[n]o language in the ADA or implementing regulations states that medical testimony is required." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 996 (10th Cir. 2019) (citation

omitted). "Instead, courts assess the necessity of expert evidence on a case-by-case basis and consider the type of disability alleged." *Id*. at 998. Accordingly, "when a plaintiff alleges an impairment that a lay jury can fathom without expert guidance, courts generally do not require medical evidence to establish an ADA disability." *Id*. at 996 (internal quotations omitted); *Felkins v. City of Lakewood*, 774 F.3d 647, 652 (10th Cir. 2014) (explaining that expert evidence is not required when the alleged impairments "are susceptible to observation by an ordinary person."). Plaintiff testified that her asthma symptoms affected her respiratory functions. (Doc. 102-43 at 2–5.) As a result, she made multiple trips to medical centers over the course of months and was diagnosed with her alleged disabilities and prescribed medications to address her asthma and other respiratory-related symptoms. (*Id*.; Doc. 102-10 at 7–10.) That testimony is supported by medical evidence, including an opinion from Dr. Pedro Murati in connection with Plaintiff's workers' compensation claim, where Dr. Murati opined that Plaintiff was having respiratory problems related to asthma symptoms. (Doc. 102-10 at 3–6.) Further, Plaintiff's Pulmonologist, Dr. Ranes, confirmed that Plaintiff was experiencing the impairments she alleged. (Doc. 87-10.) Viewing the evidence in the light most favorable to Plaintiff, there are contested issues of material fact as to whether she is disabled under the ADA.[7]

Defendants next challenge the second prong, that Plaintiff is not a qualified individual. "[T]he ADA defines 'qualified individual' as 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Lincoln*, 900 F.3d at 1192 (quoting 42 U.S.C. § 12111(8)). Plaintiff bears the burden of proving she is a "qualified individual." *Fears v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, 2019 WL 4958219, at *3 (D. Kan. Oct. 8, 2019). Here, Defendants argue

---

[7] Because the court finds Plaintiff has satisfied the first prong of her prima facie claim by showing she is disabled, the court need not address Defendants' argument regarding whether Plaintiff is "regarded as" disabled. (Doc. 87 at 15.)

that Plaintiff is not "qualified" because she could not perform an essential function: physical attendance in Building 1. (Doc. 87 at 17–19.) In response, Plaintiff disputes physical presence in Building 1 as an essential function of her HR manager position. (Doc. 102 at 31–33.)

Courts must determine whether a function is essential by considering: (1) the employer's judgment; (2) the job description; (3) the time spent performing the function; (4) the work experience of those who previously held the position; and (5) the work experience of those who currently hold the positions. *Adair v. City of Muskogee*, 823 F.3d 1297, 1307 (10th Cir. 2016) (citing 29 C.F.R. § 1630.2(n)(3)). While the Tenth Circuit instructs not to second guess employers' judgment on job-related functions, the "employer's judgment is not conclusive evidence." *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 997 (10th Cir. 2012); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003) ("[E]mployer may not turn every condition of employment . . . into . . . an essential job function.") (internal citation and quotation omitted). The Tenth Circuit has held physical presence to be an essential job function in the absence of evidence showing "that the attendance requirement was not job-related, uniformly enforced, [or] consistent with business necessity." *Davis v. PHK Staffing LLC*, 2023 WL 8757073, at *3 (10th Cir. Dec. 19, 2023) (internal quotations omitted). Here, Plaintiff has come forward with such evidence.

The job description does require on-site presence. (Doc. 102-41 at 5–6.) It further provides that "[r]emote work is less than 10% per month." (*Id*.) As Defendants point out, it is necessary for HR representatives to be readily available to employees. (Doc. 87 at 3–4.) Thus, had remote work been Plaintiff's only request, it likely would have eliminated an essential function rendering Plaintiff unqualified. But it was not. Plaintiff sought relocation of her office to Building 3, next to Building 1. (Doc. 102-6 at 2.) Defendants' corporate representatives described the buildings' proximity as a three- to five-minute walk. (Westfield Depo., Doc. 102-24 at 17:8–15; Barber

19

Depo., Doc. 106-15 at 41:7–10.)  Moreover, the record establishes that payroll employees based in Building 3 routinely interacted with Building 1 employees simply by walking between the two buildings.  (Westfield Depo., Doc. 102-24 at 17:8–15; Barber Depo., Doc. 106-15 at 41:7–10.) Finally, Plaintiff's replacement Anthony Westfield confirmed that his job description does not require him to work in Building 1 and that working in Building 3 does not interfere with his ability to perform his job. (Westfield Depo., Doc. 102-24 at 13:3–22.)  The court also notes that Plaintiff's accommodation requests were not limited to relocation—she repeatedly asked Defendants to address the mold conditions in Building 1 itself through testing, professional cleaning, and remediation.  Had Defendants remediated the mold, Plaintiff could have remained in Building 1 and performed her duties without any reduction in on-site presence.  Accordingly, Plaintiff has shown that a reasonable jury could find that the Building 1 attendance requirement for HR managers was not uniformly enforced nor consistent with business necessity given the proximity between buildings.[8]

Finally, Defendants challenge the third prong, that Plaintiff requested a reasonable accommodation.  On or about January 12 and 13, 2023, Plaintiff requested an accommodation, both through email and a formal ADA accommodation request form, that her office be moved to Building 3.  (Docs. 102-8; *see also* 102-6.)  Later, on or about May 8, Plaintiff again requested her office be moved and for a two-week extension of leave to bridge the gap between her STD leave

---

[8] Defendants argue Plaintiff is estopped from claiming she was a "qualified individual" because she simultaneously represented to the Social Security Administration, her short-term disability carrier Symetra, and the workers' compensation system that she was disabled and unable to work during the same period she now claims she could have performed her job with accommodations.  (Doc. 87 at 22–23.)  This defense is not present in the pretrial order.  As Plaintiff correctly points out, affirmative defenses not properly preserved in the pretrial order are waived.  (Docs. 102 at 2; 77 at 21–22.)  Accordingly, Defendant's estoppel argument is waived. *Wilson*, 303 F.3d at 1215.  However, even if the defense were not waived, it would fail on the merits. *See Fox v. GMC*, 247 F.3d 169, 177–78 (4th Cir. 2001) (holding that applying for benefits within a workers' compensation claim "does not estop a plaintiff from making a subsequent ADA claim").

expiring and her doctor's return-to-work date.  (Doc. 102-46.)[9]  Defendants assert that Plaintiff

failed to request a reasonable accommodation because she could not guarantee regular attendance.

(Doc. 87 at 19–22.)  Under the ADA, the employee must request a "reasonable accommodation."

*Aubrey*, 975 F.3d at 1005.  "[A] brief leave of absence for medical treatment or recovery can be a

reasonable accommodation."  *Robert v. Bd. of Cnty. Comm'rs of Brown Cnty.*, 691 F.3d 1211,

1217–18 (10th Cir. 2012).  However, "[t]here are two limits on the bounds of reasonableness for

a leave of absence."  *Id*. at 1218.  First, "[t]he employee must provide the employer an estimated

date when [she] can resume [her] essential duties."  *Id*.  Second, "[a] leave request must assure an

employer that an employee can perform the essential functions of [her] position in the near future."

*Id*. (internal quotations omitted).  Thus, an accommodation is unreasonable if the request for leave

is of an indefinite duration or the employee cannot provide a return date.  *Id*. at 1216; *Hudson v.*

*MCI Telecommunications Corp.*, 87 F.3d 1167, 1168 (10th Cir. 1996) (finding unpaid leave of

indefinite duration unreasonable as an accommodation).  Further, accommodation requests are

unreasonable if they seek irregular attendance or a leave of absence exceeding six months.  *Punt*

*v. Kelly Servs.*, 862 F.3d 1040, 1051 (10th Cir. 2017); *Hwang v. Kan. State Univ.*, 753 F.3d 1159,

1162 (10th Cir. 2014).

Here, Defendants argue Plaintiff failed to request a reasonable accommodation for two

reasons.  (Doc. 87 at 19.)  First, Defendants contend that Plaintiff never provided a definitive

return-to-work date.  According to Defendants, the only date Plaintiff ever offered—which was

July 15, 2023, communicated in her May 8, 2023, letter—was not a firm return-to-work date but

merely the treating physician's aspirational goal—Dr. Wajda's treatment notes reflect that he was

---

[9] To the extent Plaintiff argues that working from home was a reasonable accommodation outlined in her May 8 letter (Doc. 102-46), that request is not reasonable under the circumstances because the job description clearly states that on-site presence is required (Doc. 102-41 at 5–6).

"aiming for" Plaintiff to return on that date. (*Id*.; Doc. 87-19.) Second, Defendants argue that even if Plaintiff could have returned to work by July 15, her request for two additional weeks of leave after May 30 and her suggestion that she would have "unpredictable" flares from her medical conditions, which could render her "incapacitated for days," both independently rendered her request unreasonable because the ADA does not require employers to tolerate unpredictable attendance. (Doc. 87 at 21–22.)

In response, Plaintiff argues her accommodation requests were reasonable. (Doc. 102 at 33.) As to the sufficiency of her return-to-work date, Plaintiff contends that her May 8 letter sufficiently provided Defendants with a definite date of July 15, 2023, and asked only for a brief bridge of long-term disability leave to cover the gap between the expiration of STD leave on May 30 and that return date. (*Id*. at 34–35.) Plaintiff argues that a short leave request of this kind is precisely the accommodation recognized as reasonable under Tenth Circuit authority because medical conditions are inherently dynamic. Plaintiff contends Defendants' characterization of her leave as indefinite is improper because any earlier variability from her July 15 return date occurred within a period of approved STD leave. (*Id*. at 35–36.)

The court concludes that Plaintiff has sufficiently requested a reasonable accommodation to satisfy the third prong. Beginning with the leave accommodation, the record shows that Plaintiff's STD leave expired on May 30, 2023. Well in advance of that date, on May 8, Plaintiff proactively mailed a letter to Defendants notifying them that her treating physician had provided a return-to-work date of July 15, 2023, and requesting long-term disability leave (because her STD leave had expired) to bridge the gap between May 30 and July 15. (*Id*. at 46; *see* Doc. 87-19.) As to Defendants' argument that Dr. Wajda's notes reflect only that they were "aiming for" July 15 rather than definitively releasing Plaintiff, this does not undermine the sufficiency of her request.

The law requires only that an employee "provide the employer an estimated date when [she] can resume [her] essential duties." *Robert*, 691 F.3d at 1218.  An estimate is all that is required—and indeed, Defendants acknowledge as much. (Doc. 106 at 21.)  The letter indicates a return-to-work date of July 15, 2023, which satisfied this standard.  Accordingly, Plaintiff's leave request was neither indefinite nor unreasonable under *Robert*.  Moreover, as Plaintiff correctly points out, short leave requests are reasonable when, for example, they "may allow an employee sufficient time to recover from an injury or illness." *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 677 (10th Cir. 2021) (quoting *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001).  That is the very reason Plaintiff sought an additional two weeks.

As discussed previously, the request to relocate to Building 3, when taking into account the proximity between Buildings 3 and 1, combined with the current arrangement where Defendants' HR manager works from Building 3, establish that Plaintiff's request was a reasonable one.  (Westfield Depo., Doc. 106-3 at 10:18–13:5.)  In sum, the court finds that Plaintiff has sufficiently established a prima facie case for failure to accommodate under the ADA.

Defendants argue that even if a prima facie case is established, summary judgment is proper because Plaintiff was responsible for the interactive process involving her accommodation request breaking down.  (Doc. 87 at 23–24.)  "When an employee requests an accommodation for a qualifying disability, the [ADA] requires employers to participate in an 'interactive process' with the employee to determine a mutually suitable accommodation." *Brigham v. Frontier Airlines, Inc.*, 57 F.4th 1194, 1201 (10th Cir. 2023).  Here, Defendants' arguments that Plaintiff caused the interactive process to break down are merely a restatement of their unreasonable accommodation argument.  But this is the type of disagreement for which the interactive process exists.  The fact

23

that Defendants viewed Plaintiff's requests as unreasonable does not mean she abandoned the process; it means the parties disagreed, which is the condition that the interactive process is designed to resolve. *Aubrey*, 975 F.3d at 1007 (neither party may create or destroy liability simply by asserting the other caused a breakdown). Here, Defendants dispute only the appropriateness of Plaintiff's requested accommodations—not whether she participated in the process at all. The distinction matters: the former is a disagreement the interactive process is designed to resolve; the latter is a reason to find a breakdown. As such, Plaintiff has come forward with specific facts, supported by admissible evidence, sufficient to make a prima facie case as to her ADA failure to accommodate claim.

If Plaintiff makes a prima facie showing, the burden shifts to Defendants to articulate a "legitimate, nondiscriminatory reason" for terminating her. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). If the employer does so, the burden shifts back to Plaintiff to demonstrate that Defendants stated reason is a pretext for discrimination. *Id.* Here, Defendants assert that they have articulated such a reason. Specifically, the decision to terminate was made based on a neutral, company-wide policy that because Plaintiff's STD leave expired on May 30, 2023, and she did not return to the facility, she was absent and could be terminated. (Doc. 87 at 29–30.) The court finds that Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's termination sufficient to shift the burden back.

"A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *DePaula*, 859 F.3d at 970 (internal quotations omitted). "This is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id*. (internal

quotation marks omitted).  Plaintiff argues that Defendants' purported reason for her termination is pretext by pointing to multiple inconsistencies in Defendants' proffered reasons.  (Doc. 102 at 47–48.)  First, the termination letter referenced a "companywide audit of all employees on disability leave."  (Doc. 102-20.)  And Robinson testified that she drafted and mailed 12 to 14 termination letters to other employees who exceeded their allowed disability leave.  (Robinson Depo., Doc. 102-17 at 20:23–26:10.)  Yet Defendants simultaneously contend that no other employees were terminated because of an audit, they cannot locate any of the 12 to 14 termination letters, and they argue that the letters may never have existed.  (Westfield Depo., Doc. 102-24 at 168:15–171:9.)  In further contradiction, Evoy testified that Plaintiff was not terminated for job abandonment but rather because she had not provided clearance from a physician.  (Evoy Depo., Doc. 102-9 at 102:14-103:2.)  And in the letter to the Kansas Department of Labor ("KDOL") answering an inquiry regarding Plaintiff's application for unemployment benefits, Robinson stated that Plaintiff had "not communicated any intention to return" to work and was therefore terminated.  (Doc. 102-22 at 4.)  However, Robinson testified that Plaintiff's position was eliminated and there was no position to which she could return; she also testified that Westfield was not hired to fill Plaintiff's position. (Robinson Depo., Doc. 102-17 at 32:7-18, 37:1-9.) Westfield, by contrast, testified he was hired to replace Plaintiff.  (Westfield Depo., Doc 102-24 at 7:9–11.)  These varying explanations by Defendants present an inconsistent theme.

And assuming the "failure to return from leave" rationale were a single consistent theme for Plaintiff's termination; there is still a genuine dispute of material fact.  Defendants' attendance policy expressly excludes those on workers' compensation leave from being considered absent, which Westfield testified includes appeals.  (Doc. 102-29 at 53–54; Westfield Depo., 102-24 at 160:20–163:22.)  And as of May 31, 2023, Evoy and Robinson both knew that Plaintiff's workers'

compensation appeal was pending.  Defendants respond that these contradictory interpretations of policy highlighted by Plaintiff merely reflect different descriptions and not different reasons, and that "semantics cannot be turned into a triable issue."  (Doc. 106 at 26.)  But the court disagrees.  A jury could reasonably conclude from this constellation of explanations that Defendants' proffered reason for the termination is "implausible" or "unworthy of credence."  *DePaula*, 859 F.3d at 970; *Gonzalez*, 101 P.3d at 1178 (holding to survive summary judgment the plaintiff must demonstrate an issue of material fact is "unworthy of belief").

Additional support for pretext comes from the circumstances surrounding Defendants' reactions to Plaintiff's accommodation requests and the timing of her termination.  First, the temporal proximity between Plaintiff engaging in protected activities and her termination supports pretext.  *Proctor*, 502 F.3d at 1213 ("[W]e may consider evidence of temporal proximity— typically used to establish a prima facie case—in analyzing pretext…").  In deposition testimony, Robinson describes Barber's reaction to Plaintiff's persistent complaints about mold in her office as "not tak[ing] her serious" because he never sent the mold test to a lab.  (Robinson Depo., Doc. 102-17 at 48:7-50:11-13.)  *See Tadlock v. Marshall Cty. HMA, LLC*, 603 F. App'x 693, 702–03 (10th Cir. 2015) (explaining that a decisionmaker's reactions to frequent accommodation requests combined with a termination one month later lends support to the pretext analysis).  Combined, this evidence permits the reasonable inference that Defendants' decision-makers grew frustrated with Plaintiff's mold complaints and repeated accommodation requests, and that the exhaustion of her approved leave, while seeking an extension, provided a convenient—but pretextual—basis to terminate her.  The record raises legitimate questions about whether Plaintiff's termination was driven by genuine business needs or a desire to terminate a persistent complainant.  Accordingly,

26

Plaintiff has come forward with specific facts, supported by admissible evidence, that would lead a reasonable jury to find in her favor regarding her ADA failure to accommodate claim.

### 2. ADA Retaliation (Count II)

Next, Plaintiff brings an ADA retaliation claim alleging Defendants terminated her after she requested accommodations. Lacking direct evidence, Plaintiff must establish this claim under the burden-shifting framework in *McDonnell Douglas*. Thus, Plaintiff must first establish a prima facie case by showing (1) that she engaged in protected opposition to discrimination, (2) "that a reasonable employee would have found the challenged action materially adverse," and (3) "that a causal connection exists between the protected activity and the materially adverse action." *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016). After so doing, the burden shifts to Defendant "to come forward with a legitimate, non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Id*. Here, Defendants only dispute causation. (Doc. 87 at 25.)

Plaintiff must show a causal connection between her protected activity and the adverse action. Although retaliatory motive may be inferred when an adverse action closely follows protected activity, a long period of time will not suffice to show a causal connection. *See Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) ("If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection."). Looking at what courts have determined to be long versus short time periods, the "Tenth Circuit has held that a one and one-half month period . . . may, by itself, establish causation." *Fisher v. Basehor-Linwood Unified Sch. Dist. No. 458*, 460 F. Supp. 3d 1167, 1205–06 (D. Kan. 2020). By contrast, three months is insufficient. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004).

27

Plaintiff's termination on June 30, 2023, is a materially adverse action. The parties just dispute when Plaintiff engaged in a protected activity. Defendants argue the last protected activity occurred in February 2023 when Plaintiff requested an accommodation and went on STD leave. (Doc. 87 at 25.) Plaintiff, on the other hand, argues she engaged in a protected activity when she requested long-term disability leave in her May 8 letter. (Doc. 102 at 42.) An accommodation request can constitute protected activity, so long as the request seeks accommodation that would allow an employee to perform the essential functions of her position. *Herrmann*, 21 F.4th at 676. Plaintiff's May 8 letter does just that and therefore would be considered engaging in a protected activity. (Docs. 102-43 ¶ 22; 102-46.) Thus, Plaintiff has presented evidence of protected activity (May 8) followed by an adverse action (June 30) sufficient to infer causation. The approximately seven-week gap between the May 8 letter and the June 30 termination falls comfortably within the range courts have recognized as supporting an inference of causation. *Fisher*, 460 F. Supp. 3d at 1205–06. And as previously discussed, to the extent Defendants refute receiving the May 8 letter (Doc. 106 at 8, 13), Plaintiff has produced evidence of email correspondence between Evoy and Robinson on June 4–5 that reflects their awareness of Plaintiff's long-term disability claim indicated in the May 8 letter. (Doc. 102-47.) In any event, whether Defendants received the letter is a fact question for the jury; what's clear is that in early June, the decision-makers had knowledge of Plaintiff's request for a leave extension—which amounts to a protected activity.

Defendants next argue that there was an intervening cause for Plaintiff's termination, that is, her failure to return to work at the conclusion of her STD leave. (Doc. 87 at 25–26.) In support, Defendants cite *Parker v. United Airlines, Inc.*, 49 F.4th 1331, 1339 (10th Cir. 2022). However, that case does not support Defendants' position. In *Parker*, the Tenth Circuit stated that "[o]ne way an employer can 'break the causal chain' . . . is for another person . . . higher up in the decision-

making process to independently investigate the grounds for [the adverse action]." *Id*. Here, Defendants cite no evidence of an independent decision-maker conducting their own investigation into Plaintiff's termination. Defendants otherwise fail to point to any evidence breaking the causal connection between Plaintiff's request for extended leave and her termination. Plaintiff has therefore made a sufficient prima facie case. Further, for the reasons previously discussed, the court finds that Defendants have set forth a legitimate reason for termination, but the court has also determined that there is evidence of pretext to survive summary judgment. (*Supra* Section III.C.1.) Accordingly, Plaintiff has come forward with specific facts, supported by admissible evidence, that could lead a reasonable jury to find in her favor regarding her ADA retaliation claim.

### 3. Wrongful Termination – Workers' Compensation Retaliation (Count III)

Next, Plaintiff brings a workers' compensation retaliation claim. Plaintiff alleges she was terminated for requesting and exercising the benefits to which she was entitled under Kansas workers' compensation laws in violation of K.S.A. § 44-501 *et seq*. Under Kansas law, an employer cannot discharge an employee for filing a workers' compensation claim. *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002). Defendants move for dismissal on the grounds that (1) Plaintiff cannot prove causation and (2) the termination was motivated by Plaintiff's inability to perform an essential function of her job. (Doc. 87 at 26–27.)

Similar to Plaintiff's ADA retaliation claim, Kansas also applies the *McDonnell Douglas* burden-shifting framework to claims of retaliatory discharge for filing a workers' compensation claim. *Gonzalez–Centeno v. N. Cent. Kan. Reg'l Juvenile Det. Facility*, 101 P.3d 1170, 1177 (2004). "To establish a prima facie case for retaliation under Kansas law, a plaintiff must establish four elements: '(1) The plaintiff filed a claim for workers compensation benefits or sustained an injury for which he or she might assert a future claim for such benefits; (2) the employer had

knowledge of the plaintiff's workers compensation claim injury; (3) the employer terminated the plaintiff's employment; and (4) a causal connection existed between the protected activity or injury and the termination.'"  *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1212 (10th Cir. 2007) (quoting *Gonzalez*, 101 P.3d at 1177).  Further, a plaintiff in federal court who opposes summary judgment in a retaliatory discharge case based on Kansas law "must set forth evidence of a clear and convincing nature that, if believed by the ultimate factfinder, would establish that plaintiff was more likely than not the victim of illegal retaliation by [her] employer."  *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 n.2 (10th Cir. 2014).

Defendants challenge causation on two grounds.  First, that the approximately four-month gap between Plaintiff's February 2023 workers' compensation filing and her June 30, 2023, termination is insufficient to establish causation.  (Doc. 87 at 26.)  Kansas courts assess causation by first asking whether the protected activity and adverse action are closely connected in time.  *Rebarchek v. Farmers Coop. Elevator & Mercantile Ass'n*, 35 P.3d 892, 899 (Kan. App. 2001); *White v. Tomasic*, 69 P.3d 208, 212 (2003) ("Close temporal proximity between . . . the filing of a workers compensation claim and the adverse employment action may be highly persuasive evidence of retaliation.").  A period of one and one-half months may itself establish causation, while a period of three months, standing alone, is insufficient.  *Fisher*, 460 F. Supp. 3d at 1205–06; *Meiners*, 359 F.3d at 1231.  Plaintiff argues that her protected activity ought to include her ongoing litigation and appeal of the denial of her workers' compensation claim—of which Defendants had knowledge at least as late as May 31, 2023.  (Docs. 102-50; Westfield Depo., 102-24 at 185:23–187:23.)  However, the issue of whether an employee's ongoing participation in workers' compensation proceedings—as distinct from the original filing—constitutes independent protected activity has not been squarely addressed.  *See Macon*, 743 F.3d at 712 (recognizing only

30

the filing of a claim as protected activity); *Proctor*, 502 F.3d at 1212 (same).  In line with these precedents, the court holds that Plaintiff engaged in a protected activity only at the time she filed her workers' compensation claim in February 2023.

Standing alone, then, the four-month gap between the February filing and the June termination is not sufficient to establish causation.  Plaintiff can, however, come forward with additional evidence.  As the Kansas Supreme Court held in *Hill v. State*, a plaintiff may establish a prima facie case of retaliatory discharge even where temporal proximity is insufficient on its own, if the adverse action occurred "at the defendants' first opportunity to act."  448 P.3d 457, 476 (2019).  That is the situation here.  Plaintiff's STD leave expired on May 30, 2023.  Defendants terminated Plaintiff on June 30, 2023—a month after her approved leave ran out.  This one-month gap, taken in the context of Defendants' documented awareness of Plaintiff's ongoing workers' compensation appeal and internal discussions to terminate Plaintiff that took place in the first week of June (Doc. 102-50 at 2), is sufficient to establish causation.  *Rebarchek*, 35 P.3d at 899 ("[C]laimant's prima facie case is not an onerous burden…").

Defendants' contention that Plaintiff was on an unauthorized absence after May 31 because her approved leave had ended also raises a genuine dispute of fact.  Defendants' own attendance policy excluded those on workers' compensation leave from the definition of "absence."  (Doc. 102-29 at 53–54.)  And when asked about the policy, Westfield testified that workers' compensation leave encompasses the period when an employee whose workers' compensation benefit has been denied challenges that denial.  (Westfield Depo., Doc. 102-24 at 160:20–163:22.)  As of May 31, 2023, Plaintiff's workers' compensation appeal was pending.  Accordingly, Plaintiff raises a genuine dispute as to whether she was "absent" under Defendants' attendance policy at the time of her termination.

Defendants' second argument—that the termination was a legitimate business decision motivated by Plaintiff's inability to return to work—fares no better. Defendants rely on *Sanjuan v. IBP, Inc.*, for the proposition that an employer may defeat a workers' compensation retaliation claim by demonstrating that the discharge was driven by the employee's inability to perform the job. 275 F.3d 1290, 1295 (10th Cir. 2002). As discussed, Plaintiff has identified genuine disputes of fact as to whether she could have performed the essential functions of her position with the accommodation of relocating to Building 3. Because a jury could find that Plaintiff could perform her job with the accommodation of working in Building 3, Defendants cannot avoid liability merely by pointing to her inability to work in Building 1. Plaintiff has therefore made a sufficient prima facie case. Further, for the reasons previously discussed, the court finds that Defendants have set forth a legitimate reason for termination, but the court has also determined that there is evidence of pretext to survive summary judgment. (*Supra* Section III.C.1.) Accordingly, Plaintiff has come forward with specific facts, supported by admissible evidence, sufficient to support her claim for wrongful termination in retaliation for filing a workers' compensation claim.

### 4. Wrongful Termination – Whistleblowing (Count IV)

Plaintiff's final claim is a wrongful termination for whistleblowing. Plaintiff alleges she was retaliated against for reporting unsafe working conditions. Under Kansas law, an employer may not fire an employee in retaliation for whistleblowing. *Dickens v. Snodgrass, Dunlap & Co.*, 872 P.2d 252, 262 (1994). Defendants move for dismissal on the grounds that Plaintiff failed to properly make a report and failed to prove causation. (Doc. 87 at 27–29.)

To establish her prima facie case, Plaintiff must show, by clear and convincing evidence,[10] "that (1) a reasonable person would have concluded that co-worker or company activities violated

---

[10] The heightened standard applicable to Plaintiff's whistleblowing claim arises from Kansas common law and reflects the Kansas Supreme Court's deliberate choice when it recognized the retaliatory discharge tort in *Palmer v. Brown*,

rules, regulations or laws pertaining to public health, safety and general welfare; (2) prior to termination, defendant knew that plaintiff reported such violations; and (3) defendant terminated plaintiff in retaliation for making the report." *Horinek v. Spirit AeroSystems, Inc.*, 800 F. Supp. 3d 1150, 1162 (D. Kan. 2025) (citing *Palmer v. Brown*, 752 P.2d 685, 689–90 (Kan. 1988); *Goodman v. Wesley Med. Ctr., LLC*, 78 P.3d 817, 821 (Kan. 2003)). Further, reported violations of the employer may be made to company management. *Palmer*, 752 P.2d at 689–90. If Plaintiff establishes her prima facie case, it is evaluated under the *McDonnell Douglas* framework. *Id.*

Plaintiff concedes that neither the OSHA complaint filed in January 2023 by her then-supervisor, Madison, nor the OSHA complaint she filed in August 2023, amount to proper reporting. (Doc. 102 at 44.) Rather, Plaintiff alleges her whistleblowing claim is premised on her informal complaints about mold that she made to Evoy, Thomas, Barber and others. (*Id.*) This satisfies the reporting requirement. *Palmer*, 752 P.2d at 689–90 ("[T]ermination of an employee in retaliation for the good faith reporting . . . to [] company management . . . is an actionable tort."). Next, Defendants argue that because these internal communications occurred in January and February 2023 and Plaintiff was not terminated until June, that there was no causation. (Doc. 87 at 28–29.) Plaintiff renews her argument that despite sufficient temporal proximity, her discharge occurred at Defendants' first opportunity to act. (Doc. 102 at 44.) The court agrees with Plaintiff.

Plaintiff's allegations underlying this lawsuit revolve around complaints regarding the alleged existence of mold in her office. As detailed above, it was precisely these mold complaints that set off the chain of events leading to Plaintiff's termination. After repeatedly raising concerns about the mold in her office, particularly in January and February 2023, Plaintiff's medical

---

242 Kan. 893, 752 P.2d 685, 690 (1988). Because the tort operates as a judicial exception to Kansas's at-will employment doctrine, the *Palmer* court imposed a heightened evidentiary burden to prevent the exception from swallowing the rule and to screen out marginal claims before they reach the jury. *See Palmer*, 752 P.2d at 689–90.

condition deteriorated to the point she applied for and took STD leave. (Barber Depo., Doc. 102-4 at 36:19–37:12, 20:2–22:3; Evoy Depo., Doc. 102-9 at 58:15–59:11, 104:3–15.) Her leave flowed directly from the very conditions she had been reporting. Although the formal termination did not occur until June 30, 2023, the record reflects that Defendants decided to terminate Plaintiff on or near May 31, 2023, the day her leave expired. (*See* Docs. 102-20; 102-50.) Defendants' termination of Plaintiff at the first opportunity after her leave concluded, combined with her documented health and safety-related complaints, is sufficient for a jury to infer her termination was in retaliation for those complaints. *See Hill*, 448 P.3d at 476. Moreover, the evidence of pretext discussed below provides additional support from which a jury could conclude that Plaintiff was terminated, at least in part, for her reporting. Plaintiff has therefore made a sufficient prima facie case. Further, for the reasons previously discussed, the court finds that Defendants have set forth a legitimate reason for termination, but the court has also determined that there is evidence of pretext to survive summary judgment. (*Supra* Section III.C.1.) Accordingly, Plaintiff has come forward with specific facts, supported by admissible evidence, sufficient to support a claim for wrongful termination in retaliation for whistleblowing.

In summary, the record reflects genuine issues of material facts and the court therefore denies Defendant's motion for summary judgment as to liability for Counts I–IV.

### 5. Damages

Defendants move for summary judgment as to damages on three grounds—that Plaintiff: (1) cannot recover compensatory or punitive damages on her ADA retaliation claim as a matter of law; (2) cannot recover punitive damages on her ADA failure to accommodate claim because of Defendants' good faith; and (3) she failed to mitigate damages and is therefore barred from recovering back pay or front pay. (Doc. 87 at 33–36.)

34

Plaintiff brings her retaliation claim under 42 U.S.C. § 12203. She cannot recover compensatory or punitive damages under that section. The court will briefly explain the statute at issue. The ADA includes four primary subchapters. The fourth includes the prohibition on retaliation. *Id*. § 12203. However, it does not include a remedial provision, unlike the other three. Subchapter I contains the remedial provisions for employment cases. *Id*. §§ 12111–12117. Because this is an employment retaliation case, the remedial provisions of subchapter I are used. *Id*. §§ 12203(c); 12117. However, § 12117 is merely a passthrough, and provides: "[t]he powers, remedies, and procedures set forth in section[ ] . . . 2000e-5 . . . of this title shall be the powers, remedies, and procedures this subchapter provides . . . to any person alleging discrimination on the basis of disability in violation of any provision of this chapter . . . concerning employment." § 12117(a). Finally, the remedies set forth in 42 U.S.C. § 2000e–5 (Title VII of the Civil Rights Act of 1964) are only equitable. However, the inquiry is not quite over. The Civil Rights Act of 1991 expanded the remedies available in certain types of employment discrimination cases to include compensatory and punitive damages, including some Title VII and ADA plaintiffs. *See* 42 U.S.C. § 1981a(a)(2). But that statute simply does not list ADA retaliation plaintiffs. *See id.* ("In an action brought . . . against a respondent . . . who violated the requirements of . . . section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112), or committed a violation of section [42 U.S.C. § 12112](b)(5) . . ., the complaining party may recover compensatory and punitive damages . . . in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent."). Notably, § 1981a(a)(2) has no bearing on the damages available in ADA retaliation cases because it does not refer to the statute governing those claims (42 U.S.C. § 12203) like it does to the statute governing discrimination and reasonable accommodation claims (42 U.S.C. § 12112). Accordingly, the search for the applicable remedies under § 12203 ends at §

35

2000e–5.  It appears Congress did not intend to allow compensatory and punitive damages for retaliation claims under § 12203; otherwise, they would have said so.  Although the Tenth Circuit has not decided whether those damages are available for retaliation claims under the ADA, well-reasoned authorities conclude they are not.  *See*, *e.g.*, *Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 657–60 (4th Cir. 2023); *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1270 (9th Cir. 2009); *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 965 (7th Cir. 2004); *Sink v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 1085, 1100 (D. Kan. 2001); *Boe v. AlliedSignal Inc.*, 131 F. Supp. 2d 1197, 1202 (D. Kan. 2001); *Zarco v. Book & Ladder, LLC*, No. 24-2091-JWB, 2025 WL 3550600, at *5 (D. Kan. Dec. 11, 2025) ("Caselaw within this district has [similarly] found compensatory and punitive damages to be unavailable remedies for ADA retaliation.").  Consistent with the statute's text, Defendants are entitled to summary judgment on Plaintiff's ADA retaliation claim, to the extent it requests compensatory and punitive damages.

Plaintiff also objects to the pretrial order disallowing punitive and compensatory damages as part of her ADA retaliation claim.  (Doc. 89.)  Her objections are essentially a regurgitation of the arguments in her response to Defendant's motion for summary judgment seeking to bar those damages.  (Doc. 102 at 49.)  Those objections are likewise overruled, but the court will briefly address them.[11]  Plaintiff argues that Defendants waived their right to challenge the availability of compensatory and punitive damages by failing to plead it as an affirmative defense and, alternatively, failing to move to strike or dismiss them at an earlier stage.  Plaintiff's arguments

---

[11] Plaintiff argues that the standard of review is *de novo* under Fed. R. Civ. P. 72(b), contending that the magistrate's exclusion of compensatory and punitive damages from the pretrial order was dispositive. (Doc. 89 at 3–5.)  This court has previously held that a magistrate's ruling excluding punitive damages from the pretrial order is a non-dispositive matter reviewed under the "clearly erroneous or contrary to law" standard.  *Slash F. Cattle Co., LLC v. Agridyne, LLC*, No. 23-CV-1197-JWB, 2025 WL 3635768, at *2 (D. Kan. Dec. 16, 2025).  The "contrary to law" standard permits district courts to review purely legal determinations made by magistrate judges and to modify or set aside if the order "fails to apply or misapplies relevant statutes." *Id*. (quoting *Walker v. Bd. of Cty. Comm'rs of Sedgwick Cty.*, 2011 WL 2790203, at *2 (D. Kan. July 14, 2011)).  Here, the magistrate judge properly applied the relevant statutes.

reduce to the contention that Defendants failed to put her on notice of the statutory unavailability of these damages.  It is Plaintiff's responsibility, not Defendants, to know what the law authorizes.  Nor were Defendants required to plead the unavailability of compensatory and punitive damages as an affirmative defense under Fed. R. Civ. P. 8(c).  As Defendants correctly point out, the issue is a legal one and it was raised at a pragmatically sufficient time without prejudice to Plaintiff, who needed no discovery on the text of a federal statute.  (Doc. 101 at 2–5.)  Plaintiff also directs the court's attention to a series of cases affirming jury verdicts that included compensatory and punitive damages on ADA retaliation claims.  (Doc. 89 at 11.)  But none resolved the threshold legal question of whether such damages are statutorily authorized; each addressed only whether the evidence was sufficient to support the damages awarded.  Plaintiff's objections are overruled.

Defendants next argue that Plaintiff cannot recover punitive damages on her ADA failure to accommodate claim because of Defendants' good faith.  (Doc. 87 at 34.)  To sustain a claim for punitive damages, Plaintiff must show Defendant "act[ed] with malice or with reckless indifference to the plaintiff's federally protected rights." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999); 42 U.S.C. § 1981a(b)(1).  To survive summary judgment "(1) there [must be] sufficient evidence for the jury to decide whether an employer intentionally and illegally discriminated on the basis of a disability and (2) there is evidence that the employer knew the requirements of the ADA." *E.E.O.C. v. Heartway Corp*., 466 F.3d 1156, 1169 (10th Cir. 2006).

Addressing first the knowledge requirement, Plaintiff makes many arguments that a jury could find Defendants knew they were violating her ADA rights.  (Doc. 102 at 49–51.)  One has merit.  Plaintiff points to the ADA accommodation request she submitted on January 13, 2023.  (Doc. 102-8.)  This evidence carries weight because, had the relevant decisionmakers seen it, a reasonable jury could infer that Defendants were on notice of Plaintiff's federally protected rights.

37

*Wal-Mart*, 187 F.3d at 1246 (finding a jury could conclude that the employer discriminated in the face of a perceived risk where the employer's agent testified as to familiarity with the ADA).  All decision makers, Barber, Evoy, and Robinson, testified that they had not seen Plaintiff's ADA request.  (Barber Depo., Doc. 106-15 at 26:21–30:6; Evoy Depo., Doc. 106-4 at 75:17–25; Robinson Depo., Doc. 106-11 at 57:23–58:14.)  That testimony is refuted, however, by Madison, who received the ADA request and approved it on January 16, 2023.  (Madison Depo., Doc. 102-7 at 34:14–35:15.)  Madison's testimony indicated that she communicated what she perceived as a risk to Barber and Evoy that Defendants were violating Plaintiff's rights under the ADA by not accommodating her.  (*Id*. at 35:16–38:16.)  Accordingly, there is a genuine dispute as to whether Defendants "knew the requirements of the ADA."  *Heartway Corp*., 466 F.3d at 1169.

Plaintiff must also present evidence that Defendants' conduct rose to the level of malice or reckless indifference to her federally protected rights.  *Praseuth*, 406 F.3d at 1254.  The court finds Plaintiff has demonstrated a dispute of fact on this issue.  "The requisite level of recklessness [to support punitive damages] can be inferred from management's participation in the discriminatory conduct."  *Adakai v. Front Row Seat, Inc.*, 125 F.3d 861 (10th Cir. 1997) (unpublished).  Here, Defendants' managers conduct could be inferred by a jury to show reckless indifference.

In turn, Defendants argue that their good-faith compliance efforts—including Thomas's inspection and HVAC cleaning, the purchase and installation of HEPA air purifiers at Plaintiff's request, and Plaintiff's temporary relocation and remote work—negate any inference of malice or reckless indifference.  (Doc. 87 at 34.)  To show good faith "an employer must at least 1) adopt antidiscrimination policies; 2) make a good faith effort to educate its employees about these policies and the statutory prohibitions; and 3) make good faith efforts to enforce an antidiscrimination policy."  *McInnis v. Fairfield Communities, Inc*., 458 F.3d 1129, 1138 (10th

Cir. 2006) (internal quotation and citation omitted). Under *Kolstad*, an employer who makes good-faith efforts to comply with federal law may avoid vicarious punitive liability even where a manager acted with malice. 527 U.S. at 545–46. But that defense is available only where the employer made such efforts—and whether it did is itself a contested factual question here. First, Plaintiff disputes that Defendants acted in response to her complaints, pointing to evidence that Thomas did not clean the vents until well after her initial complaint. (Thomas Depo., Doc. 102-35 at 46:17–47:17.) Plaintiff contends that HEPA air purifiers were never purchased, noting that Evoy never responded to her February 16, 2023 email requesting them, which Evoy disputes. (Doc. 102-45 at 2; Evoy Depo., Doc. 102-9 at 104:3–22.) The authorized temporary relocation is similarly disputed: Barber denied the request outright on January 13, Madison overrode that denial on January 16, and Barber ordered Plaintiff back to Building 1 the moment Madison was terminated on January 19. In all, because the very measures Defendants invoke as evidence of good faith are themselves disputed, the court cannot resolve good faith as a matter of law at this stage. When there are material issues of disputed facts, questions of good faith compliance are properly decided by the jury. Accordingly, Defendants' motion for summary judgment on Plaintiff's request for punitive damages under Count I is denied without prejudice.

Finally, Defendants argue that Plaintiff failed to mitigate damages and is therefore barred from recovering economic damages in the form of back pay or front pay. (Doc. 87 at 35.) Plaintiff counters Defendants' argument on the grounds that Defendants waived this affirmative defense by omitting it from the pretrial order. (Doc. 102 at 1–2.) The court agrees. As Defendants acknowledge, they bear the burden of proving failure to mitigate, making it an affirmative defense subject to waiver. *McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205, 1214 (10th Cir. 2000). As with Defendants' estoppel defense, the failure to mitigate defense is an affirmative one that

Defendants were required to include in the pretrial order.  *Wilson*, 303 F.3d at 1215 ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived."). Defendants' failure-to-mitigate defense does not appear in the pretrial order (Doc. 77) and Defendants offer no explanation for its absence.  Accordingly, the defense is waived, and Defendants are not entitled to summary judgment on that basis.

In summary, the court summarizes its rulings as follows.  Defendants' motion for summary judgment (Doc. 87) is granted in part and denied in part.  It is denied as to liability on Counts I–IV; granted as to compensatory and punitive damages on Count II; denied without prejudice as to punitive damages on Count I; and denied as to back pay and front pay.

## III.    Conclusion

THEREFORE, Defendants' motion for summary judgment (Doc. 86) is GRANTED IN PART and DENIED IN PART; Plaintiff's motion to exclude the testimony of Ronald H. Saff, M.D. (Doc. 80) is DENIED IN PART and DENIED WITHOUT PREJUDICE IN PART; Plaintiff's motion for sanctions for spoliation of evidence (Doc. 83) is DENIED IN PART and DENIED WITHOUT PREJUDICE IN PART; and Plaintiff's objections (Doc. 89) to the pretrial order (Doc. 77) are OVERRULED.

IT IS SO ORDERED.  Dated this 22nd day of May, 2026.

_s/ John W. Broomes_____
JOHN W. BROOMES
CHIEF UNITED STATES DISTRICT JUDGE